So we're consolidating the first three cases this morning for purposes of argument. 15-1314, 15-1315, and 15-1316, Cutsforth v. MotivePower. I understand you're splitting the time with Mr. Courtney, and could you just indicate to us up front, are you taking one particular or two particular of the cases or issues or what? The 16 case, and it's the issue of obviousness in the 018 patent, Your Honor, divides cleanly that way. Mr. Courtney will be addressing the claim construction issues that arise in the 906 and 354 patents. Okay, and the case you have also involves the design issue? The design choice issue, correct. Yes, exactly. And we're running your clocks individually. Great, thank you. Okay. May it please proceed? May it please the Court. This Court's precedent is clear. The party alleging obviousness needs to proffer evidence of why a skilled artisan would combine the references to arrive at the claimed invention. And the Board needs to analyze that evidence, or the lack of evidence, and make findings on that issue. KSR tells us in 418 those findings should be explicit. That did not happen in this case. The Board failed to conduct the legally required analysis. That failure was legal error, which we respectfully submit requires this Court to reverse the conclusion of obviousness. Turning to the specific claims, Your Honor, first with respect to Claim 5, Dependent Claim 5, that claim the reference relied on is BISSET, and the argument is there'd be a modification of BISSET. There's no teaching, there's no finding by the Board of any teaching within BISSET that would suggest making the modification. Nor is there any finding that there's a general teaching in the art to make the modification. It's entirely a hindsight-based analysis that we are seeing with the Board's opinion. To look at this in hindsight and say you could take this opinion. To make the modification or to combine the references? To modify the references? So with respect to Claim 5, Your Honor, that's Dependent Claim 5, which talks about the mount block. The claim says the mount block has a spring, and that spring exerts spring force on the brush holder when it's engaged. The argument there by my friend is to modify BISSET to take a spring, spring 32, which is on a piece called the frame, which is a part of the turbine, and to move that to the mount block. So it's a modification there, Your Honor. The Board didn't say in its opinion. If the Board had said it's an opinion, if one of ordinary skill in the art from time to time will be inclined to modify a reference, or to have a design choice, if you will. If they had a little section in the law saying one of ordinary skill in the art from time to time would do that, and case law authorizes one of ordinary skill in the art to do that, and we think that's what's happened here. Would you still be making this argument if the Board opinion had said that? Well, I think your question perfectly illustrates the issue. With the answer, you wouldn't be making an argument. You'd say, no, well, you might disagree, but you wouldn't be claiming that the Board misapplied the law. Well, I would want to see what the analysis was by the Board. That's the whole problem here. There was no analysis. So I can't, it's difficult, or I might disagree. The analysis that we see post-KSR is one of ordinary skill would have been inclined or would have been motivated to make that modification, period. I mean, it's just a statement, and we see it all the time in cases coming out of the Board, coming up here, where the statement, the predicate for the conclusion is written in the opinion. But in this case, the predicate wasn't written in the opinion. Why don't we just assume it was there? There's no other basis on which the Board could have done this. Well, again, I really think your question, we're speculating, and that's the problem here. What ground would have permitted the Board to make the conclusion it did, i.e., that this design choice was made? What other, other than uttering complete arbitrary behavior, what would have led three members of the Board to say, this is the correct result? Other than the fact that one of ordinary skill in the art would have done it. Respectfully, I don't know, because they didn't do the analysis. It isn't the choice, the assumption that the Board knew what the law was. This is an unusual case, if you go back and look at the petition for review here and the rest. There wasn't much, by the way, of law larded in in front, so you see KSR cited maybe twice. So I think this Court's precedent speaks to your concern, Your Honor, if we look, for example, at the Chu case. In the Chu case, it was a bag filter, a mechanical device. And what the Court said there is there was simply no analysis done of why you would make the modification that the examiner had said would be a design choice. And that was a problem, and that's why this Court reversed. Similarly, in the Gall case, Your Honor, the Federal Circuit faulted the Commissioner for not explaining how or why this would be done. Now both of those cases also emphasize that an important factor to look at is the function. Here, I respectfully submitted that the Board had looked at the function. They would have found that they are very different. The spring in BISSETT is to make an electrical connection, and BISSETT teaches that explicitly. BISSETT says nothing about that spring being a mechanical connection that does what Claim 5 does, which is provide a tensioning force so that you've got spring force to hold that brush holder in these environments. Claim 5 explicitly requires the spring to be on the mount block to exert a spring force on the brush holder only when it's engaged. So the, it's a very... I guess to come back to it, I just think it's hard for me to believe that the Board could have met this leap of faith that you seem to think they made, unless they had been faithful in following the law, which is to say we can only do that if an ordinary artisan would have been inclined to do that. Let me ask the question, who is the ordinary artisan over at the Board? It is, it is on, it was, we put in evidence, and it was not challenged by our opponents, that it's a mechanical engineer with additional experience working in this field. The citation to that evidence is A619, that's our expert's declaration. Now the Board did not address that specifically, but that is undisputed. So it's this, it's this mechanical engineer with some experience in this brush holder field. Now... Yeah, but whether or not that ordinary artisan would have been motivated to either modify or reference, which we all agree is possible, or to combine, that's the Board that's saying we are saying the ordinary artisan, right? I'm not sure I follow the question. We can identify who the ordinary artisan is. Correct. But then the next question is, well, what's the ordinary artisan going to do when they walk up to this prior artisan? What are they going to do? Are they going to say, oh, I would modify, or I would combine? I think you're hitting on the question. So we then have an opinion by the Board that says modify and combine. Well, the Board, so with respect to claim five, they say modify, basically. And also there's a combination issue. There is, there is. I'm just smooshing these things together so we save some time. Yeah. So the Board says modify and combine. And what I'm saying is I can't see how the Board responsibly could have done that unless they were, through their mind, they just failed to say it. They were saying one of ordinary skill in the art would be inclined to do this. Your Honor, we don't know. And I can't assign, I mean, the agencies behave rationally, and we believe they behave according to the law. I can't believe that this was three administrative judges on a frolic and detour who just said, we have no reference whatsoever to what the law is. We have no reference at all to what an ordinary artisan would do. We're just going to do it in the closet. I submit that's the problem here. I would point the Court to, the Board has to do this. I point you to St. Sue, which says specifically, even if the use of common knowledge is assumed to derive from the agency's expertise, that does not substitute for authority. Zerko says that the Board's general expertise in the subject matter may provide sufficient support for conclusions as to peripheral issues, but with respect to core factual findings in a determination of patentability, however, the Board cannot simply reach conclusions based on its own understanding or experience, or on its assessment of what would have been basic knowledge or common sense. Well, it seems to me, reading the opinion, the one thing that seems to be missing here is the Board starts off with an analysis, which it purports and heads to say what the petitioner's contentions are. And then it moves forward to your arguments, some of which it deals with in great detail. I surmise, reading it, and I may be the only one, that essentially the Board, silently, was telling us they're essentially adopting the analysis and what they've laid out in terms of the petitioner. And then they say, OK, we're accepting that, except we're going to consider your arguments with respect to those. And then you may fault them for their result, but with respect to the arguments you make, they do give a fairly detailed analysis, right? I would respectfully disagree with respect to all the analysis, but especially with claims five and eight, the dependent claims. There's no analysis. There's the issue of would you combine and the issue of could you combine. There are two sentences with respect to claim five that relate to could you do it. Are you talking about now the opinion of the Board, or are you talking about the petitioner's? The final written decision. The Board, at 25. Remember what the Chief Judge, I think, was saying, and also was in the back of my mind, was that I went back and looked to see, well, what, because it's clear from the Board's opinion that they are adopting, right, the arguments that would be made to them by the petitioner. So I said, we'll go back and look at the petitioner's argument. It looked to me like the petitioner, there's flesh on the bones in the petition that you say is absent in the Board opinion. We are, if I may address that, with unclaimed five, the argument now being offered to this court was not originally offered in the petition that you could move that spring. That was not in their petition. If you look at their petition at A95 and 96, the original argument was you could simply, that spring boots, and that's good enough. They didn't see or think that it was necessary to move it to the mount block. They pointed out on our response, hey, the claim says it's the mount block. And then they pivoted and replied. So they didn't even make that argument. With respect to claim A, it is similar, Your Honor, that the argument they made to the Board there is the same. It's essentially the same argument, but there was nothing in it addressed, would you combine it? And if we look at the Board's final decision on claim A, there's just absolutely nothing there. They don't even, in claim A, use the word design choice. I would submit under this Court's precedent, both in terms of the design choice cases, Chu and Gall, and under Sang-Soo and Zirko. Well, the design choice language shows up in a kind of serendipitous way. I can point you to legions of 103 cases where design choice was behind what was happening, but the words weren't used to describe the analysis. The fact that the design choice words pop up to me doesn't carry much weight. As you can see, when you read an opinion, you can see where that's what. This design choice has to do with modifying a previous reference, right? So, and you know, even recently the Court issued its opinion, Belden v. Burktach, and that is not a design choice case, but I think that case is very instructive. That was a case involving cables and the use of the patent was about preventing twisting of the core in the cables. And in that case, in finding the independent claim obvious, here's what the Board pointed to. And this Court affirmed, if I, there was a teaching in the reference that you would align the core in the cables. And the Board said, and I think quite reasonably, in this Court said, well, if you know to align it, you know you're preventing twisting. We don't have anything like that here. We have a claim, or a piece of prior art that uses this thing for one function, a claim that's a very different function. And absolutely, the Board didn't even attempt to point to anything in the BISSET reference, either for claims five or eight. You're past your time, so I'm going to, but let me ask, can I, if I can just ask you a really technical question? Yes, please, Your Honor. Because we've got three different cases. The mounting block issue is presented here. Is that the same issue that Mr. Courtney is presumably going to talk about? And if, hypothetically, we were to agree to, on that, what does that do to this case? So you're exactly right. It's the same issue, and he's going to address it in the 354 patent. Now, if the court finds cuts forth on these obviousness issues, and we submit them, given the record, reversal is appropriate, it is not necessarily, it's not necessary for the 018 claims. However, it is important for the 354 claims. Yeah, but what happens if we rule against you on the argument you're making now? That's what the judge doesn't have to do. Yes, Your Honor, then we would ask that the court reach the mounting block issue. Does that apply? What's it do? What it means is Cartman doesn't have a mounting block, so the combination falls apart for that reason. So the case, the whole case falls apart? So you win on that case without claims? Yes. You win on that case, but on the other round. We win on the other round, correct. You win on Mr. Courtney's round, not on yours. Correct, Your Honor. OK, well, let's hear from Mr. Courtney. Why don't we begin briefly where we just were with mounting block. Mounting block is in the 306, the 354 patent. The board improperly found that the broadest reasonable interpretation of mounting block would cover a mounting block that moves about during the coupling operation. We think that's inappropriate. All of the examples in the specification make clear that the mounting block is, in fact, fixed in place in a column 15, line 12. This is to the 354 patent that some of these citations are true. It seems to me that the issue is, given the broadest reasonable interpretation, the board may be right that, in the absence of the word fixed, it's susceptible to a broader interpretation. Was there any, I know if you do an amendment in this context, obviously, it's going to prejudice you in terms of your past infringement. But was there any amendment going on in these proceedings? There was some claim cancellation for some of these, but no amendment. Cuts Forth sought to have its claims reviewed by the PTAB, just as they would be reviewed in district court. And would it, do you agree that it would have satisfied the board if the word fixed had been inserted before mounting block? In the text of the claim? Yeah. That clearly would have resolved this issue. However, we don't think that amendment was necessary to achieve this. Because? Because of the clear disclaimer in the specification. In column 15, line 12, we have a statement that the lower mount block 16 being the only portion that must be fixed to a location. I think that's a clear statement by the patentee that that's what needs to happen. I would also note that every embodiment in all the figures shows a lower mount block that's sort of bolted into place. The word welding is used. The word keyed or pinned is used. There is, throughout the specification, repeated reference to securing that thing in place, fixing it so that during subsequent coupling operations it doesn't move about. On the point you make that the spec calls out use of keys and pins and bolts, does that necessarily mean that it would not be moved with every proceeding? I mean, is that the same as necessarily as saying fixed? I think when we look at the weight of the statements in the specification, we have the word fixed in column 15. We have these statements about welding, keying, pinning, bolting. We have the figures which show bolts being inserted into holes that hold that thing in place. We take that all together. We have a circumstance where the patentee is clearly embracing a mount block that stays in place. This is akin to the Abbott diabetes case. Can I ask you just another housekeeping question, which is we're talking about the 1315 case, right? The 354 patent? Yes. OK. You've got the selective coupling issue there, too. It's my understanding that selective coupling goes into one claim, but would the mounting issue go to all claims? That's correct, Your Honor. All right. So why don't you tell us a little about selective coupling. Gladly, Your Honor. Selective coupling is independent. Can I ask you a question just about mounting for a second? If you look at figure 15B, it's on page 26 of the statute. It's the one that shows the bolts coming up through the bottom and going through the elliptical receptacle hole. Yes. And was the board's view that that shows that you're not fixedly held down because it can slide back and forth? The board has an allusion to that. There are these elongated holes into which the bolt and sort of a spacer fits. Our interpretation of this figure is that those elongated holes are to get the mounting block into the appropriate position, right? Those screw holes are- If you look at the elongated holes sitting on top, is number 45, number 45 is the bolt, is the nut that the bolt goes into? Yes. It looked to me like it was designed to just slide exactly right down into the hole, that there wasn't any slippage one way or the other. That's also our interpretation. So that when you put the bolts up, it's locked, it's fixed. That is also our interpretation of that figure. What else is there that suggests non-fixedness in that drawing? That has to be the notion that somehow the nut that's elliptical also can slide back and forth. Is that the idea? We are trying to now stand in the shoes of the board in terms of what it meant. We don't think there is any notion of movement or slippage in this figure. We think the compressive force of the screw is going to hold that in place, plus the way it fits. Well, if you were going to draw number 45, the nuts, to show them sliding into the hole where they fit, if you wanted to show that they fit real tightly, how would you do it other than what they've done in that drawing? I can't think of a way one could imagine. If you made the nuts very much smaller than the hole, that would be suggestive of some movement, right? It might suggest that. You'd need to deal with the compressive force of the bolt going into the nut, which I think would otherwise hold it in place. In fairness, I should note that there is a Belleville washer 185 that has some flex in it, and the board may have been referring to that. But I don't think that changes the overall fixity. We're seeing your mounting block argument standing along with your selective coupling argument, standing along with your extending from argument. You've got a series of arguments where what you're trying to say is, well, go look at the spec, and you understand very clearly that the broadest reasonable interpretation was too broad. But in the selective coupling issue, you've got another leg to stand on. You've got claim differentiation. So you've got an extra boost up to say, oh, we're not just reading a limitation of the claim from the spec. And on extending from, you've got the language itself. So aren't the selective coupling and the extending from arguments necessarily stronger than the mounting block argument? We believe in all of our arguments, but certainly the Well, I don't believe in all your arguments, Mr. Corden. You wouldn't be here otherwise. But I mean, you're adding up data points when you're doing claim construction, and you're trying to say, oh, I'm not going to violate the whole rule that you can't read the limitation in from the spec, but the spec is talking to you about this. Don't you feel more comfortable when you've got something else going for you, like claim differentiation or the language itself, extending from telling you that we've got to be going this way? Certainly. The term selective being inserted there certainly has to separate claim two of the three, five, four. What the chief judge was asking, in a way, is that where BRI is at stake, and it's kind of a close call, then doesn't the tie go to the board? I mean, you have a situation where you have some examples in the spec, and the question is, are we going to limit the claim to that? And we're not in the US District Court under Phillips. We're in the patent office in front of a mongrel, if Justice Souter ever would have seen one, in terms of the standard. But of necessity, the broadest reasonable interpretation is supposed to be broader than claim construction in the district court. So in a situation like this, when you're comparing, extending from selective coupling and then mounting block, why doesn't mounting block just necessarily fall over onto that side where you say, well, it's OK? And I think the reason is that word reasonable in the broadest reasonable interpretation standard. I think on mounting block, the board has embraced a construction that just goes beyond everything in the specification, and that's not reasonable. I do want to make sure we have a chance to talk about the 906 patent. In the 906 patent, again, we see some of these themes. The board is vitiating structural requirements that are in the independent claim 14. Independent claim 14 describes functional structures, like a brush cache, but it also describes how those structures relate to and connect to other structures. The board seems to have emphasized the first and ignored the latter, and actually vitiated the latter with its claim construction. This happens in a couple places, but the first place it happens is on the term brush cache coupled to the beam. That word coupled to has meaning. It doesn't say the brush catch is part of the beam. It doesn't say the beam includes a brush catch. It says coupled to. And that means, we think, distinct physical structures brought together into a coupling relationship. And so why is broadest reasonable? As you were just saying, it has to be reasonable. I mean, take away the word broad, because we're allowed to do it broader. What is unreasonable about the board's construction? The board's construction contemplates a relationship between the brush catch and beam, where they're the same structure. And that's improper. This court's Becton Dickinson opinion said it's unequivocal, where a claim says connected to. You don't connect to yourself. Two structures may connect to one another. And so that's what should happen here. Coupled to should mean. Coupled to, in your reading, means brought into connection with. That's correct. And you can't bring something into connection with if it's already there. That's right. And so we think this is a clear structural physical limitation. Once this court, we hope it will do, cleans that up, the board's rejection under claim 14 falls apart. And that's because of the way the rest of the claim fits together. Claim requires a beam that's in sliding engagement with the mounting block. And it requires a brush catch. The board's analysis points to the same structure for both. It points to resilient member 56 as having sliding engagement. And the brush catch, thereby vitiating the coupled to relationship. And we need to read, but we need to, if we agreed with you on the brush issue, we still need to read the projection extending issue. And we need to reach both of those issues. They're independent bases for. There is the other reference, the Olmstead reference. You can't just do one. I think we have two attacks on the Olmstead reference. First, this theme we've been talking about, about the board failing to respect the structural definition in the claim, applies on claim 19 for Olmstead. Claim 19 says the brush catch includes a spring. But the board's analysis for the spring points to something that's in the beam. So the board is pointing, again, to the wrong structure. It needs to find a spring in the brush catch, which in Olmstead are the little metal teeth 25. There's no spring in there. Olmstead doesn't meet the requirements of claim 19. And then turning to the projection, we think the dictionary. Because the legs can't compress it, can't create a spring effect? This is the structural issue. The legs are the beam in Olmstead. And the teeth are the brush catch. If the brush catch includes a spring, that means the spring has to be inside those little teeth somehow. That's not what's happening. We're in anticipation here. This is a 102 rejection. There's not structural identity between these two. And I think reversal is appropriate. And there is reversal, because there's no obviousness to say that the petition is exclusively anticipation. That's correct. Also, the other side, MPI, does not assert that under the correct claim construction, the claim construction's cuts forth is proffering, that there would be any anticipation. We think the record is clean for reversal. The same way you don't argue that there is not anticipation if we disagree with your claim construction. I mean, I think under the fact that both sides are rising and falling on the claim construction. It's a legal issue that's appropriate for review at this stage. I do want to talk about projection. There's dictionary evidence. The court is familiar with it. I think all the dictionaries plus common knowledge. There's a projection that has to jut out from its surroundings. The board evidenced some confusion and said, well, the direction, maybe it juts down. Maybe it juts left. It has to jut. It doesn't necessarily have to jut out. It has to jut. That's what we're about. That's what our proposed construction is aimed at. I think the board's approach to this term, they're operating under ordinary meaning. But when they applied it, it became clear that their ordinary meaning was overbroad. They applied the term projection to a little, like a parking garage ramp that goes down. Why isn't that jutting down? I think it's not jutting at all. It's descending into sort of, it's milled out of a surface. It doesn't project or jut in any way, respectfully. So we think the rejection over Olmstead, in addition to the claimant. You don't think of a downward ramp in a parking garage as extending downward? When I think of it extending, you know, this doesn't extend. And the ramp is connected to the flat surface. The car's sitting here. You go to the edge, and they point your car down. It's going to go down the hill. So maybe I chose a bad example, because in the parking garage, the ramp goes below. I'm on level one. The ramp goes below level one and extends into level two. In Olmstead, that's not happening. The little ramp just cuts through the side of the box. That's it. It doesn't extend below. Do we know that? I think the figures are clear. Is it clear from the specification in Olmstead? I believe it is clear. Where? I mean, all I saw was the drawing. I think the drawing is what we're standing on in the description of those as ramps through the sidewalk. But we're talking about ramps in the garage that can extend downward. There's ramps, and there's ramps, I suppose. I think these particular ramps only extend through the wall of the brush box. They don't go further. Can I ask you about the beam limitation? Yes. The beam limitation. The board found it was an elongated support structure. What's wrong with that claim construction? And do you need to prevail in order to win on this? Take those questions in reverse order. I think the other arguments we've presented provide a basis for reversal. This is not our only basis for reversal. So if I don't agree with you on this, there's still, because it's hard just to keep track of all the different claims and the three different patents. If I don't agree with you on beam, but say I agree with you on everything else, hypothetically. If you agree with me on everything else, I think reversal is appropriate for the 906 patent. So why don't you tell me what's wrong with elongated support structure for the word beam? That's not a technical definition of a beam. I think even under BRI, it's appropriate to look at what the meaning would be to a person of skill in the art. And a person of skill in the art here looks to set up the patent. That's correct. And we think there's unrebutted dictionary and textbook evidence here, unrebutted expert testimony, that a beam has a technical definition that But let's look at figure 16. Figure 16 in the 906 patent is described repeatedly as being a beam. Now, a beam doesn't just include the back plate. The beam includes the edges. The beam includes the upper locking pin. The beam includes the pinholes. Does this picture look like a long, straight, structural member? I think it does. I think it's tough. No, seriously? Seriously, Judge, I do. I do. I think it's credibility here, counsel. I mean, look at this. It's in multiple dimensions. This is nothing like an I-beam or any of the other things that you describe as a beam, which granted, my plain understanding of the word beam would absolutely consist with what you say it should be. But I feel like you're living in a plain meaning world and not owning up to what you actually disclosed was a beam in your own patent. And that's why I corrected your initial statement about, is it beam as one of ordinary skill in the art would construe it, or beam as one would have to construe it in light of the patent? The patent discloses this is a beam. It's the upper beam, yes. As opposed to the lower beam, right. Well, OK, this is a beam. So if this is a beam, so it's clearly not the long, straight thing that you said it was because there's no way that this is long and straight. No way. So if this is a beam, then why isn't Kroll's or whatever with its U shape or Olmstead with its other shape likewise beams? I mean, I don't know what the heck to make out of the word beam in light of the patent's own use of it. And that's why I'm like, hmm, I think elongated support structure is not looking so bad all of a sudden to me. Then let me, at least, and I'm out of time, let me focus on Olmstead briefly. Olmstead is a springy structure. It flexes back and forth. That's not rigid. That's not what a beam is. When we build things out of beams, we don't expect them to flex. In fact, we design them to flex minimally when they're under load. Olmstead is the opposite. OK, but wait. But the patent office said elongated support structure. In that implies a degree of rigidity. You can't have a rubber band. That's not an elongated support structure. Or a spring is not going to be deemed an elongated support structure. But then we're getting into not the matter of claim construction, but the matter of does substantial evidence support a determination that that particular structure in the anticipatory reference fits the definition or not. Respectfully, I'm not sure it is at all clear that the board viewed rigidity as part of beam. Because it applied to Olmstead, was it expressly flexible? It has to be a support structure. How can you have a non-rigid support structure? A rubber band can't be a support structure. I agree with you on the one hand. And yet, I'm bound by where the board said Olmstead, which is resilient members flexing back and forth, and the board said that's a beam. So I have to assume that the board viewed the meaning of beam as broad enough to encompass that. I'm running very short on time. I'd like to reserve some rebuttal. Yes, sure. We'll reserve three minutes of rebuttal. Thank you, Your Honor. Good afternoon. May it please the court. It's important to take a look back and kind of figure out how this patent portfolio fits into the whole thing. And to keep in mind that there were five patents originally challenged at the patent office. OK, you've got so much stuff you've got to cover in 30 minutes. The look back at the history of the world is just not the way to go. Focus, let's start one at a time. Projection extending from. How can something recessed into something else be a projection extending from? Seems, quite frankly, the opposite of the word projection, the opposite. Not even sort of maybe not quite usually the way we think of projection, but actually the opposite of the way the word projection normally operates. I would disagree, Judge Moore, with respect to it being a recess. The board found that it had to extend from a surface of the mounting block. And so that ramp extends from a surface of the mounting block upwardly. I mean, I have the picture here of figure one. There's a cut out. And the little orange ramp, I think mine is color coded by my clerks, is my guess. Yes, OK, so you don't have orange on yours. The little orange ramp is actually recessed into the cut out. It doesn't actually protrude at all, at all from the sideways surface of Olmstead's project. Yes, but it extends up from the horizontal surface that's inset there. So that's what the board found is that it has to extend up. Only because there's a cut out. It doesn't actually extend beyond the horizontal surface. It's that the horizontal surface is cut out, so it can be fit into that horizontal surface. But it extends up. From the cut out. So that's like saying something's a projection if I dig a hole and bury it because it projects from the bottom. We're looking at figure one on Olmstead, right? And when I'm talking about the horizontal surface, I'm talking about the base of the ramp. It extends upwardly from that base and extends to a point. That's, I believe, what the board found in its decision. It said nothing limits the direction in which the projection must project. Cutsworth wants it to project outwardly from an outer surface. It does project up from, and what I'm talking about, Your Honor, is the bottom of the ramp 59. There is a horizontal surface there, and that ramp extends up from that surface. Right, because the horizontal surface was cut out to slide the ramp into it. That's the part that seems pretty clear from the picture. OK, let's move on to your next argument. Sure, moving on to a brush catch including the spring. The brush catch includes the spring. I think you'll see in figure 12 of the Cutsworth patent, the spring is actually a separate piece from the brush catch. It's a leaf spring that comes off of the brush catch. The brush catch is a generally kind of straight member with a tooth coming off of it, and there is a spring attached to it, just as in the Olmstead reference. There's a brush catch 25, and the board found that the resilient part of Olmstead at the bottom of the beam there, and it's only that small part that deflects, because if you look at the figure we were just looking at in Olmstead, the top part of the beam actually fits behind the box, and only the bottom part deflects, and that part is riveted to the brush catch. I'm confused. In Olmstead, what's the spring? The spring is on the beam, or is it on the brush catch? It would be the bottom part of the beam. So if you're looking at figure 1. So does the brush catch include the spring, or does the beam include the spring? The brush catch is coupled to the beam, and the bottom part of the beam is the spring. So there's a spring coupled to the brush catch, just in the Cutsworth patent. In figure 12, there's a separate. Doesn't claim 19 say wherein the brush catch includes the spring? It does, and in the Cutsworth patent, the spring is a separate piece from the brush catch. If you go to figure 12 of the Cutsworth patents, there is a brush catch, 118, and then there's a separate piece, 112, which is the spring. They're two separate pieces. So the brush catch includes the spring by having something connected to it, just as in Olmstead. Are you going to address the 018 patent? Yeah, why don't we shift to that, Judge Clevenger? With respect to the 018 patent, I think there was an argument the board conducted an improper obviousness analysis, and I don't think that's the case. I think if you look back to page A2 of the board's decisions, they indicated they considered the prior art, the petition, the patent owner response, the petitioner reply, and the arguments made at the oral hearing. And they went on to find, in view of these arguments and evidence, the board found petitioner met its burden by a preponderance of the evidence. So they found the arguments that were presented and the evidence considered that the petitioner met its burden by a preponderance of the evidence. Let's go back to A2. Were you sending me to A2? Yes. I'm looking at A2. I granted the petition. It was nine grounds. We had trial on some. We filed a response. We filed a petition. Oral hearing was held. We have statutory authority. The reasons that follow, bang. Didn't you say there was more on page two? What were you telling me was on page two? The board laid out all of the evidence and all of the arguments they considered and then indicated that we determined the petitioner. They didn't do that on page two. No, on page two it said, for the reasons that follow. So we're holding our breaths for the reasons that follow. Well, up above was where they indicated. Up above, like where up above? Like show me. Sure. So in the background, motive, power, petitioner, filed a petition. Filed a petition. Good. That was great. The board granted. Did you say we read the petition? I assume that the board considered the petition. I'm just calling you out because you were reading more into page two than non-page two. OK, well, let's shift to the analysis of the board. And there's an argument that they did not follow the KSR rationale. On page 15 of our red brief, we talked about KSR. And KSR elaborates that, quote, when they're, elaborates that when, quote, there are a finite number of identified, predictable solutions, a person of ordinary skill in the art has good reason to pursue the known options within his or her technical grasp. And if this leads to the anticipated success, it is likely the product not of innovation, but of ordinary skill and common sense. And I would indicate that's what the board did here. With respect to claim five, there's no argument there's not a spring in the prior art. There are two possible positions to position the spring. The board said, when faced with a finite number of solutions, it would be a design choice as to where to place it. With respect to claim eight, regarding the move. Doesn't that quote say where there is a design need or market pressure to do so? Quote, there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. You left out the first part, right? And that's the part they're complaining about. Their complaint is, it's not enough to just say, it's a design choice. What the Supreme Court said is, when there is a design need or market pressure to solve a problem, then blankety blankety blank. But I don't see the board's opinion. You may have articulated some good reasons in your brief, but I don't see any of those in the board's opinion itself as to where the design need has been established or what the design need is or what the market pressure is. I mean, I'm just reading straight from KSR on my computer the first part of the single sentence that you read the second part of. So you kind of left out the sort of important part, which is the part they're arguing. Yeah, all I can say is I think that the board identified it as a design choice, recognized that there were two possible places based on the prior art before them, and said that it would have been obvious for a skilled artisan to move it to the modified mounting block in that, with respect to Clayton Park. Why? What is the design need or the market pressure? What's the problem with the way it was before? What is the advantage to be achieved by moving it? Why? Why would a skilled artisan have made that design choice? With this being a dependent claim, I don't think there was necessarily the same problem presented in the prior art that way. And I think the board considered it. I mean, in the patent that way. And I think the board considered it that way. There was the Olmstead reference that was before them that did have the spring on the brush box. And I think that they considered the prior art in arriving at their decision. That's the point. The board didn't say any of that. I mean, that's not a bad argument. And if that is what their opinion had said, maybe this would feel like a really different case to me. But their opinion doesn't. And what about the fact that the two springs function completely differently in Iset as opposed to Cutsworth? One is a mechanical spring that works in a mechanical fashion to achieve the result. And the other is a spring that's used completely and utterly as an electrical spring. The movement is not only are you going to move it, but you're going to entirely change the function and nature of the use of the spring. And that's all just going to fall into the, yeah, it's a design choice. Yeah, I don't think it changes the function because it is a U-shaped spring and there's a knife edge that goes into it. So it would exert a spring force on there and provide the same mechanical biasing that's called for in the claim. The rest of the claim says spring applies spring force against at least a portion of the brush holder component when the brush holder component is mounted to the mounting block. When the spring from Iset is moved from the base to the mounting block, there's no evidence that this spring force is going to be satisfied. No evidence in this record. And if I'm wrong, you show me where it is. I don't think there's an explicit teaching, but when it's moved, the brush holder component still has a knife edge that slides in and that spring would apply spring force to that component of the brush holder. And the problem with that is you may be right and you may actually be able to convince the board of all of that, but the board didn't address it or analyze it or anything. How am I supposed to do that and appeal to replace, there are two words, design choice, with everything you just said about how the spring would or wouldn't operate if it were moved. I mean, we're changing the nature, at least as far as the disclosure goes of the functioning of the spring. We're moving it to a different place and there's the rest of that element that they don't explain. I don't know how I can read all that into the words design choice without any explanation. The only thing I can tell you, Your Honor, is that I think they addressed the party's arguments and so the argument, as you're articulating it, might not have been presented to the board. No, it wasn't. I went back and looked because I was worried about that too. It's in there. They expressly argue that the remainder of the claim requires applying spring force against at least a porcelain brush holder. They expressly said it wouldn't, there's no evidence, and they didn't say it wouldn't do it. They said there's no evidence at all that it would work that way if it was moved because they don't have the burden of proof. So they didn't say it wouldn't, but they just said there's no evidence at all that it would do any of that if it were moved. So I did go back and look to ensure that the argument was raised. It was, I don't know. I should let you move on. You still have a lot of, can you talk to me about, talk to us about when your adversary was up there and we were talking about the same thing, he said that in your petition for review, I think he cited A95-96. He said you didn't have any of this rationale about the spring. I think we argued for the combination of the spring would be moved to the modified mounting block, and during the course of the proceedings, they raised additional arguments, and we responded to those, but I think in the petition, we argued for the combination of the modified mounting block to include the spring. Can I move you to mounting block? Sure. Because even under the broadest reasonable interpretations, Mr. Courtney pointed out, we need reasonableness, and it seems to me there's a lot in the specification, including the use of the word fixed, and everything they're talking about is bolting and pins and keys, all of which connotes a fixed location. Sure, so I think- What's wrong with that? I think there are a couple of points to consider there. First, and let's focus on the 354 patent, which is Appeal 1315. The use of the word fixed in the patent is in quotations. It's not, it's in quotations. It's quote fixed in the patent, and the board first noted, and this would be at the bottom of A9 of the 1315 decision, the board made, the board said, when a word or term is not used functionally, but is referred to as a word or term itself, it is either italicized or enclosed in quotation marks. And so they had the fact that it's shrouded in quotation marks makes the use of it in that passage not to be taken literally. So it's one of the things they pointed out. It was unclear. And we're talking about disclaimer. He argued for disclaimer in the patent. And so if the word fixed is in quotation marks, I don't know how that can rise to the level of disclaimer. So this was discussed on A9 and it's footnote two in the 1315 appeal, but there's another part of the board- Is it really disclaimer? Are we really doing a disclaimer analysis? I mean, is it clear that mounting block, that would, you'd need a disclaimer if it was absolutely clear that any ordinary or plain meaning of mounting block excludes fixed. And so therefore you need an absolute- Well, I think the argument Mr. Courtney raised was a disclaimer and I was rebutting that if it is a disclaimer, the use of the quotations, I think, doesn't rise to the level of disclaimer. What about the reference to bolts and everything else when we're talking about this? I think that's one embodiment. And so if you go to page A8 of the board's decision in the 1315 appeal, they say midway through the page, they talk about, in fact, the specification makes a point of not limiting the attachment of the mount to any particular- I'm sorry, I'm trying to find where you are. Sure, it's about 10 lines down. Okay. It says, in fact, the specification makes a point of not limiting the attachment of the mount to any particular method, fixed or not fixed. And I think the parenthetical here is important. It says, or other attachment scheme may be used to secure the lower mount block 16 to a mount base near a moving conductive surface or in position to move relative to a conductive surface. So if the lower mounting block is capable of moving, I don't know what the fixed limitation adds to it. And the board goes on to this page to say, Cutsforth has pointed to an embodiment, some embodiments, but they don't cover all embodiments. So in the embodiments where the mounting block- What in the real world would moving relative to a conductive surface mean? Just describe to me what happens in the structure. I know what happens if you're mounting it and you're bolting it to something tight and fixed. And that's the construction that your adversary is arguing for. I'm just asking in my own mind, what does putting it in a position to move relative to a conductive surface, what does that mean? I think it means that the mounting block can be attached to something and part of it can be movable. Part of what? Part of the mounting block can be movable. And in the mounting block- Where would you move it to? What would be the purpose? Well, I think one example is in the mounting block in the patent, there's an upper mounting block and a lower mounting block, and they can move relative to each other. One thing I'm confused about, this is not necessarily you, but I want to ask you what your thoughts are. I thought I understood Cutsforth to stand here and tell us there's a disclaimer and that's why we should find fixed, and I didn't catch it at the time, but now as I'm sitting here, it's like I went back to their brief and I thought that they argued there was no disclaimer, but nonetheless, the board could make this structural decision. Did they argue disclaimer or not before? I believe the first time I heard it was today. I don't recall seeing it in their brief. And that's what the broadest reasonable interpretation I think still has to be consistent with the specification and cannot read out embodiments. So the board found with respect to, if you incorporate the word fixed, it would, in their opinion, read out certain embodiments from the specification. And while we're on the claim construction issue, I think one- I'm mentioning the embodiment of which, of the one that's positioned relative to the new relative? Yeah, positioned to move relative to the conductive surface, or the one where the mounting block- You're moving relative, aren't you still, haven't you still fixed the thing tight? So two tightly fixed things are moved relative to one another? I don't think that's required by the claim, and I think the board- I'm just trying to get at it. I mean, you're reading an awful lot into a position to move relative to a conductive surface. Yeah, I think part of the board's opinion is that they weren't sure what fixed meant because does fixed mean that you can't fix it and then unscrew it, take it off, and put it back on? So they were concerned with the use of the word fixed, limiting it to some specific embodiment. And they pointed to the words, the use of the word secure sometimes, and they didn't- And why is the prior art under the claim construction of the board fixed? Under our opinion, the prior art still is fixed. The Cartman mounting block was fixed. There are screws that come in that hit the mounting block and it's tightened up against a clamp. So we argued down below that it is fixed. They've asked you to reverse. I don't think you can reverse on any of the claim construction issues. I think you could vacate and remand because we made the argument under Cuts for this claim constructions that these were disclosed. The board never reached the claim construction arguments under Cuts for this position. So to the extent any of the claim construction issues are reversed here, I think they would have to be sent back down to the board to consider them under the fixed limitation. And I think under the fixed limitation, the board would find the Cartman clamp is fixed because those screws are tightened down and it's fixed in place. That's what we believe is required by fixed. And that's why the board had a little confusion as to what exactly was meant by fixed. And I think an important point was that there was an opportunity to amend here. And that opportunity was foregone. They could have amended the claim fixed. Well, that doesn't kind of resolve the whole issue. I mean, that's all going forward, but that wouldn't certainly change what's going on here. It's not a zone-free, it's not a cost-free decision to amend, right? You are correct. With respect to the beam, I think the board properly found that there's no reason to limit it to a rigid structure or a straight structure. I think- Well, when you say no reason to limit it to rigid, they certainly didn't put the word rigid in the construction. However, they did say it has to be a support structure, right? A rubber band couldn't be a support structure. I wholeheartedly agree with you. I mean, there was pictures of all the different things that could be- Their construction does import into it a notion of rigidity sufficient to perform the function of the beam. I agree with that. I agree with that. And I think there's no testimony that even under the Olmstead, it has some flexibility, but it's still a support structure. And when their expert was questioned about it, I couldn't identify how much deflection there would be. And with respect to it being straight, I think the board really hit on the point you made earlier, Judge Moore. When you look at the beam, it's not straight in all directions. So in which direction is it straight? For the first time on reply, Cutsworth has said, well, it's straight in the perpendicular direction along its axis. That's the first time we've ever heard that argument. It came up in reply. It could have been presented to the board. And do you agree with Mr. Courtney's response to Judge Moore about just the play of the various different things? If we were to agree with their side on the projection and the brush catch, then even if we would disagree on the beam, the case would still be reversed. With respect to- I think that's what I understood was the play there between the various. Let me find my notes on that. Yeah, with respect to the projection that affects the Olmstead reference only, and with respect to the- Brush catch is Crowell's, right? Yeah, brush catch. The mounting block. Brush catch coupled to the beam affects the Crowell's reference. So if you were to find on both of those in Cutsworth's favor, you could vacate and remand for consideration under their claim construction. I mean, in terms of the projecting from, isn't that a 102 rejection? It is a 102 rejection only for the Olmstead reference, though. If there are two references for purposes of the 906 patent, there's two 102 rejections. And so- But you don't think we can reverse? I don't think you can reverse because they didn't consider the... We made the argument that it does project out under their construction down below, I believe. And I don't think that the board made a finding under their construction. The ramp is what you're talking about, projected out? Yes. When we say it doesn't project out, it projects anyway and projects down. I think you can make that finding, but I think the board did not consider that construction in arriving at its finding. I think the only thing that you didn't hit on was selectively coupled. Do you want to go there for a second? Sure. So selectively coupling is an interesting one. I don't think that the claim differentiation- One other thing before we move on. When you said we should remand to consider anticipation under their claim construction, did you ever argue that below, alternatively, that even under their construction, the claims would be anticipated? We did argue that below. I don't know if we argued it for all of the claim constructions. I'd have to look at it. But I know, for example, on the beam, we argued that the Cartman beam was- If you didn't do it for projection, for example, because I think that maybe you didn't for all of them, like you're saying. So that wouldn't be remanded for them to reconsider the Olmstead reference in light of the new construction of projected if you didn't argue anything different, right? That's correct. To the extent we did not argue it. But I believe that for the majority of them, I believe we did argue them. Thank you. I think you were gonna respond to Judge Moore's question about what's the difference between selective coupling and coupling. Yeah, selective coupling. So the board at 810 of the 1315 appeal noted that they rejected the notion that there must be a specific predetermined way in which the brush holder component is coupled to the mounting block. And- We know that's what they said. What's the difference between coupling on the one hand in an independent claim and selectively coupling in an independent claim? Have to be different. Then I'm having trouble. I know that, yeah, they do have to be different. So for coupling in the independent claim means that it's capable of coupling. It doesn't specify the manner in which it couples. So it's really describing only the mounting block. Capable of being coupled. Capable of being coupled. Yeah, it's either coupled or non-coupled. And so what the board found is in the specification of the Cutts-Firth patent, it's this over-the-center locking mechanism. There's a position where it's not coupled at all. So the brush holder's in my hand. I put it on, it's coupled in a disengaged position. It's like an off-non-switch electricity, right? Then you slide it and it's coupled in the engaged position. In Cutts-Firth, and it's- Right, but I mean, if you have, if I'm right, it's like a light switch on the wall. It's on or off. If it's on, it's coupled. If it's off, it's not. No, that's not correct, Your Honor. Why not? If you go to Cutts-Firth- Why not? Why shouldn't I be looking at coupled light switch? Not selectively coupled, coupled. Yeah, but for coupling, yeah, it's either on or off. Yeah, on or off. Right, so you're on or off. So I have a light switch, right? And it says coupled, on or off. And I have another light switch that says this one is selectively coupled. It's not coupled on or off. It's somehow coupled differently. Well, we're not dealing with light switches, and I think if we look at- No, we're not, but it's just my hypothetical. What's the difference in this case? I think if you look at the patent- Selectively coupled has to mean more than just coupled or not coupled, which is what coupled means in the independent- That's correct. So in the way that this works and described in the patent, when it's pushed all the way on, that over-the-center locking mechanism extends and it couples it. You can undo it, and it's disengaged, but still coupled to the mounting block. And if you go to page 20 of Cutt's first reply brief for the 1315 proceeding, I think you'll see this illustrator. And if you're at that page, there are a set of three figures that are indicated there. And in the left-hand side, it illustrates the mounting block in green. And in the middle position is the disengaged position. You'll see, as Cuttsworth even admits in the parenthetical down below, the mounting block and brush holder are coupled together in the disengaged position. So it's slid on, it's not engaged, but it's coupled. And then- Can I, I don't mean to derail you, but just to ask another procedural-type question. If we disagreed with you on this, we'd have to vacate and remand. We couldn't reverse, because you separately argued obviousness that the board didn't address. Is that right? Yeah, there are a number of grounds the board didn't address for this specificity. Keep going, I didn't mean to derail you, sorry. But if you look at that diagram, the third figure shows it is coupled in the engaged position. So what the board found was selecting between coupling states. So you have, it's coupled, it's disengaged, you slide the handle, it's still coupled, but now it's engaged. So those are the coupling states that it was talking about. And so I think under Judge Klebinger, the point you were trying to make about the independent claim being broader, this requires it to have two different coupling states. The independent claim could be just one coupling state where it's on or off. So it's attached in a different mechanism. And what is selecting? The fact that you've selected that? You've selected between coupling states. So in the middle figure there, you'll see that the beam is kind of in an up position and the end of it is still engaged with the mounting block. So the beam, there's an upper beam 18, it looks like, that's kind of fixed in a V position, it's hinged. So this is still coupled to the mounting block, but it's disengaged. And when you slide the handle that's not pictured, it actually spreads out and locks into place and so that would be coupled in the engaged position. So these two right figures on 20 of, page 20 of Cutthroat's reply brief illustrate the two coupling states that the board talked about, selecting between coupling states, disengaged or engaged. And this is a read based on the specification of the PET. One of the last issues I'd like to address is kind of the projection extending from, come back to it. Part of the issue is we've heard that projection is something that must jut out, but there's also the extending from the language. And so I'm not sure from Cutthroat's construction what jutting out really adds. It talks about something that does extend from a surface. And I think the board properly found, in the Olmstead reference at least, that it extends from that horizontal surface, upward from that horizontal surface. Not convinced. Embedding something within is just not projecting. When you dig a hole out and put it in so it's surface level, or worse yet, below surface level, it's hard for me to conclude it's projecting just because you dug the hole. Well, I mean there was an example of something that was described as projecting out in the Cutthroat's patent and it was a little pin, but it didn't project out from its surroundings. There were walls all around it. So I guess for me it's hard to understand what projecting out means under their construction if there were, if it was projecting out from one surface but there were walls around it, would that still be projecting out? You know, I don't understand the limitation of what projecting means in their mind. So, and I think what you're saying is if those walls weren't there on the side, if it ended there, it would be projecting out. Is that correct? I just don't, if you embed something within and it actually, I just don't see how it can meet the definition of projection. I don't see anything, at least I don't see anything in their patent that redefines it the way I did for Bean, for example. Thank you. Mr. Courtney. If he's the court, I'd like to first, a judgment that came up, I think I may be responsible for this and I apologize for it. We are not arguing disclaimer as to mounting block. If I said that. If I said that, you said there's a disclaimer right here at this column, this line number. And I will own that, Judge Moore. And I apologize to MPI for that. That is a misstatement on my part. I do want to talk about Judge Clevender, you had some questions about what it means to move relative to a conductive surface. And here we're talking about the term mounting block. I think what that means is these brush holders can be mounted, their mounting block can be put on sort of a swingable arm. You swing it out of place and you've got to work on it and move things around and you swing it back into place, turn the machine back on, get back to work. I think that's at least one example of what moving relative to a conductive surface might be. I do want to take a minute and talk about selective coupling. We had some conversation about that right at the end of my adversary's presentation. I think the patent is absolutely clear as to what selective coupling is. Selective coupling is where you couple in a manner that selects where the brush is going to go. Alignment is very important in these devices. You've got to get that graphite brush lined right into place. That's what selective coupling is. What do you do with the argument of your adversary based on your page 20 of your reply brief? I think page 20 of our reply brief describes this selective coupling absolutely. It shows how the brush goes from the brush holder. On the left it's not shown at all and by the time you get to the right it has been selectively coupled. The brush is precisely positioned. That position is dictated by the physical configuration of the components. It will never come into selective coupling in any other position. Every time you use it, the brush goes to the same place. And that is, at one point I thought- His argument is that your drawing shows so couple has coupled in two states, engaged or disengaged. And so you can select to be coupled engaged or you can select to be coupled disengaged. I think that was his argument. His argument sounded like that. I think- And the drawing seemed to demonstrate that. Respectfully, I disagree. This is to try to find some meaning for the dependent point. That's right. Right, and I think the board's attempt to find meaning was to embrace this selecting between coupling states. I think that's a circular notion. Things are coupled or uncoupled. That's what's shown here. They're coupled or uncoupled. There aren't states. Selectively coupled, you now have a gloss, a narrower notion of what coupling is. You've brought these things into alignment. I do want to touch briefly on the 018 patent. I think the 018 patent, the board's analysis, this so-called design choice analysis, is the embodiment of hindsight and failure to lay out. It's KSR-required, and it's this court-required. I do want to make sure we talk about it. Kinetic Concepts, 1368. This court went into detail that there's a need to show the reasons why things come into combination. It's not sufficient to just say, well, it could be done. I see my time is up. It is. Thank you. We thank all sides on the cases of kinetic.